UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRENDA ARNOLD,

    Plaintiff,

v.

CITIZENS FIRST BANCORP, INC.,

    Defendant.
                                    /

Case No. 09-10832

Honorable Patrick J. Duggan

## **OPINION AND ORDER**

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on November 20, 2009.

PRESENT:        THE HONORABLE PATRICK J. DUGGAN
                           U.S. DISTRICT COURT JUDGE

On March 5, 2009, Brenda Arnold ("Plaintiff") filed this lawsuit alleging that Citizens First Bancorp, Inc. ("Defendant") violated her rights under the Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.* Specifically, Plaintiff alleges that Defendant terminated her employment on August 25, 2008, to interfere with her rights under the FMLA and to retaliate against her for attempting to assert those rights. Presently before the Court is Defendant's Motion for Summary Judgment, filed on August 13, 2009. The motion has been fully briefed and the Court held a hearing on November 12, 2009. For the reasons set forth below, the Court grants the motion.

**I. Factual and Procedural Background**

Corren Smith ("Smith"), one of Defendant's human resources business partners, hired Plaintiff to work as a payroll clerk for Defendant on August 6, 2007.[1] In that position, Plaintiff processed Defendant's payroll and dealt with paid time off for Defendant's employees. On December 5, 2007, Plaintiff received her 90-day evaluation from Smith and Daryl Conrad ("Conrad"), Plaintiff's direct supervisor. Plaintiff received a positive evaluation overall and was described as "a great asset to the HR Team." (Def.'s Mot. Ex. 4.) Nonetheless, the evaluation also suggested a few areas for improvement and noted that Plaintiff sometimes came across as "condescending" when dealing with Defendant's employees. (*Id.*)

In the months that followed Plaintiff's evaluation, Conrad received several complaints regarding Plaintiff's treatment of Defendant's employees. (*See* Def.'s Mot. Ex. 2 at 23-24; Exs. 5-6.) Conrad discussed these issues with Plaintiff on several occasions. (Def.'s Mot. Ex. 2 at 23-24.) Then, on March 24, 2008, Plaintiff became engaged in a verbal argument with a co-worker, Sue Junak ("Junak"). (Def.'s Mot. Ex. 3 at 36-39; Ex. 7.) Conrad discussed the incident with Plaintiff and Junak and warned both that future incidents could lead to termination. (Def.'s Mot. Ex. 3 at 39.)

By summer 2008, Defendant had begun a transition to a new software program that would change how payroll was processed. In anticipation of the impact the transition would have on Plaintiff, Conrad asked Plaintiff to go to lunch with him at an off-site restaurant on July 25, 2008. At the lunch, Conrad did not limit the conversation to the software transition;

---

[1] Prior to this hire date, Plaintiff was assigned to work for Defendant as a temporary employee by a temp agency.

he also discussed Plaintiff's interactions with other employees and recommended that Plaintiff seek counseling through Defendant's Employee Assistance Program ("EAP"). (Def.'s Mot. Ex. 2 at 26-33; Ex. 3 at 43-45.) Conrad believed that counseling could reduce Plaintiff's stress levels, help her manage the transition to the new software, and improve her interactions with other employees. (*Id.*) Plaintiff did not appreciate being confronted about the topic in public and reacted emotionally to Conrad's suggestion. (*Id.*) Later that evening, Conrad e-mailed Plaintiff the contact information for a counselor at the EAP; he concluded the e-mail by saying, "I really think it would help and I'm only concerned about your health and well-being." (Pl.'s Resp. Ex. B.) Plaintiff did not follow through with Conrad's suggestion at that time. (Def.'s Mot. Ex. 3 at 48.)

On July 30, 2008, Conrad received another complaint regarding Plaintiff's interactions with Defendant's employees. (*See* Def.'s Mot. Ex. 9.) Shortly thereafter, Conrad began preparing Plaintiff's annual performance review. Plaintiff again received a positive evaluation overall; the evaluation indicated that she had "good performance" and "goes beyond basic requirements." (Def.'s Mot. Ex. 10.) Conrad described Plaintiff's work ethic as "excellent" and indicated that she "is probably the hardest working employee in the department." (*Id.*) As to areas for improvement, however, Conrad requested that Plaintiff be more open to suggestions and criticism, engage in more positive and optimistic communication with other employees, and focus on stress management. (*Id.*) Conrad reviewed the evaluation with Plaintiff on August 19, 2008. Although Plaintiff fell into the same performance category as her prior evaluation, Plaintiff expressed frustration that her

3

numerical score had decreased.[2]

The next day, Conrad sent Plaintiff an e-mail requesting that she direct questions regarding payroll documentation to him before asking Defendant's outside auditors. (Def.'s Mot. Ex. 11.) Although the e-mail concluded, "Thanks and keep up the good work," Plaintiff felt that she was being written up. (Def.'s Mot. Ex. 3 at 56.) Still upset regarding what she considered a poor performance review from the day before, Plaintiff began crying in response to the e-mail. (*Id.* at 57.) About an hour later, Conrad emerged from his office into the cubicle area where Plaintiff sat with other human resources employees. According to Plaintiff, Conrad walked up behind her and asked, "Now what are you upset about? Are you upset because you're not going to be asked to go to the meeting, and Sally is?" (*Id.* at 55.) In response, Plaintiff complained that some of her co-workers were "backstabbers" and she threatened to quit her job. (*Id.* at 60-61.) During the exchange, Conrad asked Plaintiff to calm down on several occasions and also asked Plaintiff to step into the hall. (*Id.*) Plaintiff refused to go into the hall because she was afraid that employees from other departments would see her. (*Id.*) Before the incident was completely resolved, Conrad had to leave for the day and Plaintiff went to the restroom to compose herself. (Def.'s Mot. Ex. 2 at 45-46.) At some point, Plaintiff returned to her desk and e-mailed a Resignation Notice from her work e-mail to her personal e-mail address. (Def.'s Mot. Ex. 14.) Meanwhile, Conrad decided that he would terminate Plaintiff's employment unless she accepted responsibility

---

[2]In her 90-day evaluation, Plaintiff received a numerical score of 80.46. In her annual performance review, Plaintiff received a numerical score of 75.77. Scores falling between 75.1 and 87 fit into the category titled, "Good Performance. Goes Beyond Basic Requirements." (Def.'s Exs. 4, 10.)

for the outburst, expressed remorse, and agreed to conditions of continued employment, including a promise that there would be no further disruptions. (*Id.* at 50-51.)

The next day, Thursday, August 21, 2008, Plaintiff did not appear for work. Plaintiff e-mailed Conrad to inform him that she would be taking a sick day and was making arrangements to see her doctor. Additionally, Plaintiff complained about her annual review, the e-mail regarding questions to auditors, and the July lunch appointment during which Conrad had suggested counseling. Plaintiff informed Conrad that many of the problems in payroll resulted from late submissions by other employees, not her own conduct. Finally, Plaintiff indicated that she would no longer work on Saturdays or take work home with her. (Def.'s Mot. Ex. 15.) In response to Plaintiff's e-mail, Conrad informed Plaintiff that he considered her conduct on the previous day to be unacceptable. He further informed Plaintiff that she would have to meet with him before returning to work. (*Id.*)

Later in the day on August 21, 2008, Plaintiff saw her personal physician and a counselor at the EAP. Plaintiff's physician suggested that she take a leave of absence and wrote her a note to excuse her from work until Monday, August 25, 2008. The EAP counselor, Lisa Tate, agreed and faxed a note to that effect along with the physician's note to Conrad. (Def.'s Mot. Ex. 16.) Plaintiff's physician ultimately increased Plaintiff's dosage of Prozac to mitigate Plaintiff's depression and prescribed Ativan to help her with anxiety.[3] (Def.'s Mot. Ex. 3 at 12, 15, 18-21.) Between her appointments on August 21, 2008, Plaintiff sent an e-mail to a friend regarding the prior day's events and her visit with her

---

[3]Plaintiff had been on Prozac for three to four years prior to the August 20, 2008, incident.

5

physician. In the end, Plaintiff expressed concern that she might "be out of a job at the end of the day." (Def.'s Mot. Ex. 17.) Plaintiff's friend responded that Plaintiff "should have [her] doctors put [her] on a stress related leave of absence from work." (*Id.*) The next day, Plaintiff sent an e-mail request to one of her co-workers in human resources, Sonjia Davis, for short-term disability and FMLA forms. (Def.'s Mot. Ex. 18.)

Meanwhile, Conrad made arrangements for his anticipated meeting with Plaintiff the following Monday. Conrad drafted a document reflecting the conditions of continued employment that Plaintiff would have to accept to avoid termination. The conditions required that Plaintiff apologize for her conduct, avoid further outbursts, follow directions, maintain positive communications with other employees, and be accountable for her communication problems. (Def.'s Mot. Ex. 20.) Conrad also drafted a written warning to document the outburst and warn Plaintiff that further problems would result in disciplinary action. (Def.'s Mot. Ex. 21.) Conrad doubted, however, that Plaintiff would accept such responsibility for her conduct and requested that another employee be prepared to take over Plaintiff's position on Monday, August 25, 2008. (Def.'s Mot. Ex. 2 at 96; Ex. 13 ¶ 4.)

On Monday, August 25, 2008, Conrad and Plaintiff met before the workday began. Plaintiff appeared at the meeting with her short-term disability forms partially filled out and tried to discuss taking FMLA leave with Conrad. Conrad, however, refused to discuss Plaintiff's leave requests until they addressed the August 20, 2008, incident. Conrad presented Plaintiff with the conditions of continued employment but Plaintiff refused to read or sign the document, asserting that her counselor had informed her not to enter any agreements in her emotional state. When Plaintiff refused to sign or accept responsibility for

6

her conduct, Conrad terminated her employment. (Def.'s Ex. 2 at 75-81; Ex. 3 at 69-78; Exs. 23-24.) Plaintiff later obtained certification from her physician indicating that she had a serious medical condition warranting a leave of absence. As indicated above, Plaintiff filed the present lawsuit alleging an FMLA violation on March 5, 2009, and Defendant now seeks summary judgment.

**II. Standard of Review**

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512.

The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255. The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." *See id.*

### III. FMLA

Under the FMLA, an eligible employee is entitled to take up to twelve weeks of leave in any twelve-month period for "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The act further provides that, upon return from leave, the employee is entitled "to be restored by the employer to the position of employment held by the employee when the leave commenced; or . . . to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." *Id.* § 2614(a)(1). To ensure the protection of these rights, the FMLA prohibits employers from interfering with an employee's exercise of the rights and from discriminating or retaliating against an employee based on his or her attempt to do so. *See id.* § 2615. In this case, Plaintiff alleges that her termination amounted to both interference and retaliation. The Court addresses each theory of recovery in turn.

### A. FMLA Interference

The FMLA interference theory allows an employee to recover whenever "an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave." *Arban v. West Pub. Co.*, 345 F.3d 390, 401 (6th Cir. 2003). To prevail on such a claim,

> an employee must prove that: (1) she was an eligible employee, (2) the defendant was an employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave the employer notice of her intention to take leave, and (5) the employer denied the employee FMLA benefits to which she was entitled.

*Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006). Though this framework does not require consideration of the employer's intent, "the FMLA is not a strict-liability statute." *Id.* Therefore, "interference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct." *Id.* at 508.

While the parties present some argument regarding the various elements of an interference claim, the primary issue in this case is whether Defendant's termination of Plaintiff's employment resulted from a legitimate reason unrelated to Plaintiff's exercise or attempted exercise of her FMLA rights.[4] Defendant maintains that Conrad terminated Plaintiff's employment because of Plaintiff's conduct on and before August 20, 2008. Plaintiff argues, however, that Conrad actually terminated her because she exercised a FMLA-protected right to refuse to sign the conditions of continued employment while on leave.

Accepting the evidence in the light most favorable to the Plaintiff, as this Court must in evaluating a motion for summary judgment, the Court concludes that there remains an issue of fact as to Conrad's reason for terminating Plaintiff. There is evidence in this case

---

[4] There is no dispute in this case that Plaintiff is an eligible employee and Defendant is a covered employer under the FMLA. The parties do dispute, however, when Defendant obtained notice of Plaintiff's desire to take leave, whether Plaintiff adequately supported her application for leave, and whether Defendant actually denied Plaintiff's request.

9

that Plaintiff's counselor advised Plaintiff not to make employment related decisions in her emotional state and that Plaintiff informed Conrad of this advice. Although Conrad maintains that he terminated Plaintiff based on her conduct on and before August 20, 2008, Plaintiff was not actually terminated until after she refused to sign the document prepared by Conrad. Viewing the evidence in the light most favorable to the Plaintiff, then, there is evidence that Plaintiff was terminated because she refused to sign the document, not because of her conduct on and before August 20, 2008. As such, the Court is not prepared to conclude at this time that, as a matter of law, Plaintiff's termination was unrelated to her FMLA leave and Defendant's motion for summary judgment as to Plaintiff's interference claim is denied.

**B. FMLA Retaliation**

Plaintiff also seeks to hold Defendant liable under the FMLA based on a retaliation theory. FMLA "retaliation claims impose liability on employers that act against employees specifically *because* those employees invoked their FMLA rights." *Edgar*, 443 F.3d at 508. As discussed, there is an issue of fact in this case regarding Defendant's reason for Plaintiff's termination. As a consequence, the Court also denies Defendant's motion for summary judgment as to this claim.

Accordingly,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment is **DENIED**.

                                          s/PATRICK J. DUGGAN
                                          UNITED STATES DISTRICT JUDGE

Copies to:
Joey S. Niskar, Esq.
Gary A. Fletcher, Esq.